BANKERS' SURETY CO. OF CLEVELAND, OHIO, et al. v. MAXWELL.

(Circuit Court of Appeals, Fourth Circuit.    February 3, 1915.)

No. 1298.

1. UNITED STATES ⬤═67—CONTRACTORS' BONDS—EXTENT OF LIABILITY—"PERSON SUPPLYING LABOR."

One employed by a contractor to superintend the construction of a public building, whose duties require him to act as a working foreman, is a "person supplying labor," within the meaning of Act Aug. 13, 1894, c. 280, 28 Stat. 278, as amended by Act Feb. 24, 1905, c. 778, 33 Stat. 811 (Comp. St. 1913, § 6923), and is protected by the contractor's bond given thereunder.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ⬤═67.]

2. PARTNERSHIP ⬤═9—CREATION OF RELATION—SHARING PROFITS AS COMPENSATION FOR SERVICES.

An agreement by a contractor for a building to pay his superintendent of construction a salary, and in addition as a bonus a share of the profits of the contract, if any, did not create a partnership, where there was a clear understanding that it should not, and that the superintendent should not share in any loss.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 23, 24; Dec. Dig. ⬤═9.]

3. ESTOPPEL ⬤═58—EQUITABLE ESTOPPEL—PREJUDICE TO PERSON ASSERTING ESTOPPEL.

That a superintendent of construction on a public building, who had a power of attorney from the contractor to draw checks in payment of indebtedness incurred in the work, did not draw checks for his own salary, but permitted it to accumulate, does not estop him from recovering the same from the surety on the contractor's bond, on the latter's insolvency, where the money he checked out was applied in payment of other claims, which would have been enforceable against the surety.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 144, 145; Dec. Dig. ⬤═58.]

4. PAYMENT ⬤═39—APPROPRIATION BY CREDITOR—SECURED AND UNSECURED DEBTS.

A creditor, who has two claims against his debtor, one secured and one unsecured, in the absence of special direction to the contrary, may apply funds in his hands in payment of the unsecured claim.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 104–114; Dec. Dig. ⬤═39.]

Appeal from the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Suit in equity against the Bankers' Surety Company of Cleveland, Ohio, and the Maryland Casualty Company of Baltimore. From a decree in favor of E. D. Maxwell, intervener, defendants appeal. Affirmed.

D. Lawrence Groner, of Norfolk, Va., for appellants.

Leon Goodman, of Lynchburg, Va. (Harper & Goodman, of Lynchburg, Va., and David Stern, of Greensboro, N. C., on the brief), for appellee.

Before PRITCHARD and WOODS, Circuit Judges.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

PRITCHARD, Circuit Judge. In July, 1909, Cecil L. Saunders entered into a contract with the United States for the construction of a post office building at Clifton Forge, Va. The Bankers' Surety Company became surety on his bond. Upon the completion of the building, some $8,000 or $10,000 of accounts for materials furnished the contractor remained unpaid, and suit was instituted in the District Court of the United States for the Western District of Virginia, against Saunders, the Bankers' Surety Company, and the Maryland Casualty Company, the latter company having taken over the Bankers' Surety Company and assumed payment of its then outstanding obligations. A number of creditors intervened in the action, the claims of all of whom were settled, except the claim of the present intervener, E. D. Maxwell. The matters involved in this appeal, therefore, relate wholly to his claim.

The intervener (appellee) superintended the work of building the post office. At the time the contract was made appellee was in the employ of Saunders at Ithaca, N. Y. Among other things, the appellee in his deposition stated that just before he came to Virginia to construct the post office he was offered a position in New York City at a salary in excess of $300 a month; that he acquainted Saunders with this fact, and told him that he had always received more money than he was getting from him; that Saunders told him that, if he would go to Virginia and build the post office which he (Saunders) had contracted to build for the government, he would pay him $200 per month, with an increase later on, or give him $150 a month and in addition thereto a bonus of one-third of all profits made on the job, but that he (Maxwell) was not to share in any of the losses; that it was not a partnership, and was not to be considered as such, but "simply as a gadfly to make me work harder, and get as much more done as I possibly could do, so that there would be a better profit for him and myself."

Appellee further testified that when Mr. Saunders gave him the power of attorney to sign his checks that it was done, not only to protect Mr. Saunders, but appellee as well, and that in order to leave no doubt about the matter he went to see a lawyer at Clifton Forge, who advised him that it would be best for him to "give Mr. Saunders a personal honesty bond, which would preclude any thought of partnership so far as the state of Virginia was concerned"; that he accordingly executed a bond to indemnify Saunders, and that it transpired that there were no profits so far as the books showed; that there would have been a profit if Mr. Saunders could have collected all of the outstanding obligations and a proper credit had been made for the other jobs, for which he borrowed money from the Clifton Forge job; that as a result of this course of dealing he paid out approximately the sum of $30,000; that he drew money on account, but did not draw money there, being under the impression that the final payment was coming and that he would get his whole salary in a lump sum.

At the hearing before the District Judge, by consent, the case was transferred from the common-law to the equity side of the court. The defendant surety companies filed their answer, the deposition of the

intervener was taken, and a decree for $1,270.27, the whole amount of the claim, with interest at the rate of 6 per cent. per annum from January 26, 1912, until paid, was duly entered by the District Court, and it is from this decree that this appeal was taken.

The first assignment of error appears to have been abandoned by counsel for the appellant, and therefore we do not think it necessary to devote any time to the discussion of the same, further than to say that we are of opinion that the court below, in this instance, followed the proper practice under the circumstances.

[1] The second assignment of error is to the effect that the court below erred in refusing to decree that the intervener was "a person supplying labor" within the meaning of the act of Congress. Act Aug. 13, 1894, c. 280, 28 Stat. 278, as amended by Act Feb. 24, 1905, c. 778, 33 Stat. L. 811 (Comp. St. 1913, § 6923). It was the manifest purpose of Congress in the enactment of this statute to protect the rights of parties performing labor as well as those supplying material for the construction of public buildings. Such being the case, this act should be interpreted so as to effectuate the intent of Congress by giving the same a liberal construction.

It is insisted by appellants that appellee was a superintendent partner, and that he was not, therefore, a laborer within the meaning of the statute. The Supreme Court of the United States in the case of Mining Co. v. Cullins, 104 U. S. 178, 26 L. Ed. 704, in passing upon this question, said:

"He was not a contractor. The services rendered by him were not of a professional character, such as those of a mining engineer. He was the overseer and foreman of the body of miners who performed the manual labor upon the mine. He planned and personally superintended and directed the work, with a view to develop the mine and make it a successful venture. He appears from the findings to have performed duties similar to those required of the foreman of a gang of track hands upon a railroad, or a force of mechanics engaged in building a house. Such duties are very different from those which belong to the general superintendent of a railroad, or the contractor for erecting a house. Their performance may well be called work and labor. They require the personal attention and supervision of the foreman, and occasionally, in an emergency, or for an example, it becomes necessary for him to assist with his own hands. Such duties cannot be performed without much physical exertion, which, while not so severe as that demanded of the workmen under the control of the foreman, is nevertheless as really work and labor. Bodily toil, as well as some skill and knowledge in directing the work, is required for their successful performance. We think that the discharge of such duties may well be called work and labor, and that the District Court rightfully declared the person who performed them entitled to a lien, under the law of the territory."

Also the following cases are very much in point: Phœnix Furniture Co. v. Put-in-Bay Hotel Co. (C. C.) 66 Fed. 685; Stryker v. Cassidy, 76 N. Y. 52, 32 Am. Rep. 262; Field & Slocumb v. Consolidated Co., 25 R. I. 319, 55 Atl. 757, 105 Am. St. Rep. 895.

In 27 Cyc. 43, the text is as follows:

"The lien is usually allowed for services in superintending the construction of a building or other improvements."

The appellee filed a deposition which constitutes the only evidence bearing upon the question as to the nature of his employment. He

states positively that he was employed as working foreman, and that as such it was his duty "to go among the men and actually build the building." He further says:

"I suppose there wasn't a stone, nor a sash, piece of iron, piece of trim, or a part of the heating or electric light plant that I did not actually assist in placing in the building. Most of the concrete forms I actually put in myself. * * * There was never a day that I wasn't actually occupied in the construction of that building in a suit of overalls."

The work he performed was such as to bring him within the purview of the statute. Therefore, in view of this evidence, we are of opinion that the court below was correct in so finding and decreeing accordingly.

[2] The third assignment is to the effect that the court erred in refusing to find that the appellee was a partner of the general contractor, and therefore not protected by the provisions of the bond sought to be enforced. Again, we have the uncontradicted evidence of the appellee to the effect that neither he nor the general contractor had any intention of forming a partnership in connection with this work. Appellee testified in regard to this matter as follows:

"* * * Would give me $150 per month and a bonus of one-third of the profits that might be made on the job, but that I would not share in any of the losses. It was not a partnership. It was not to be considered as a partnership, but simply as a gadfly to make me work harder, and get as much done as I possibly could do, so that there would be a better profit for him and myself. * * * When I went to Clifton Forge, so that there would be no misunderstanding as to the partnership, because I did not want to go into partnership, when Mr. Saunders gave me the power of attorney to sign checks, I wanted to protect, not only himself, but myself, and went to see a lawyer in Clifton Forge, who advised that the better way to do was for me to give Mr. Saunders a personal honesty bond, which would preclude any thought of partnership, so far as the state of Virginia was concerned."

His testimony in this respect clearly established the fact that it was not the intention of either Saunders or appellee to form a partnership. However, it is insisted that the agreement to share profits is an indicia to a partnership contract. While such is true, in this instance it is not conclusive, in view of other circumstances and conditions which negative such relationship. It does not appear that there was a contribution to the common capital by the appellee, nor was there a community of interest in the amount involved. By the express terms of the contract he was to be paid for his services, and therefore it cannot be reasonably insisted that he contributed any services. In the case of Jackson v. Haynie's Adm'r, 106 Va. 365, 56 S. E. 148, the court in discussing this phase of the question said:

"The principles of the law of partnership lead to the conclusion that, if a trader makes an arrangement in regard to a commercial business with another, by reason of which that other becomes interested as owner in the resulting profits, while they are undivided and remain as profits, the two are partners, the general rule being that to constitute a partnership there must be a community of interest inter sese, and that the parties should share the profits and losses. It is, however, far from being universally true that a mere participation in the profits constitutes the party a partner. At most it is true only sub modo. * * * If a party has no interest whatsoever in the capital stock, and, as between himself and the other party, has no rights as a partner, or no mutuality of powers and duties, but is simply employed

as an agent, and is to receive a proportion of the profits as a compensation for his labor and services, he will not be deemed a partner." Meehan v. Valentine, 145 U. S. 624, 12 Sup. Ct. 972, 36 L. Ed. 835; Berthold v. Goldsmith, 65 U. S. (24 How.) 536, 16 L. Ed. 762.

A fair and reasonable interpretation of this contract, in view of the evidence, shows that it was not the intention of the parties thereto to form a partnership, nor does it follow as a matter of law. Therefore this assignment of error is without merit.

[3] By the fourth assignment of error it is insisted that appellee is now estopped from asserting his claim against appellants, in that he had sufficient funds in his hands with which to have satisfied his claim, and that it was his duty to have done so, and thus, having failed to protect his rights, his failure to do so was prejudicial to the rights of the appellants, and he should not now be permitted to assert his claim.

It does not appear that the sureties were injured by the payments made by appellee. If he had retained an amount sufficient to pay his claim, and refrained from paying such amount to the creditors, then such creditors would have had claims to that extent against the contractor for which the sureties were bound, and in such event appellants would have been in no better position than at present, and they certainly cannot, therefore, be said to have been injured by the application which appellee made of the funds in question. We fail to find anything in the record which in any wise tends to show that appellee had knowledge of the fact that appellants were surety for the contractor at the time that he paid out these several amounts. Therefore the facts are not such as to bring this case within the rule invoked by appellants.

By the fifth assignment of error it is insisted that the appellee was "estopped from asserting his claim against appellants because he permitted and allowed the diversion of funds by the general contractor to the payment of claims arising upon a different contract." It is further insisted that such diversion of funds was with "Maxwell's connivance."

Appellee stated in his deposition that the money which came into his hands each month was placed in a bank to the credit of the contractor. While the testimony shows that appellee was authorized by power of attorney to check out the funds in question, nevertheless it further appears that in every instance the funds were checked in the name of Saunders, and in addition thereto Saunders himself drew out various sums by check. The appellee in his deposition, among other things, testified as follows:

"Q. And that money was entirely under your control? A. It was under Mr. Saunders' control. Q. But it was in the bank and you had the right to draw it out? A. Yes, sir; I drew some of it out, and he drew some of it out. Q. That is to say, you had a power of attorney from him to sign checks for him for that work? A. Yes, sir; for that work only."

It appears from the testimony that the total amount received from the government and deposited amounted to $83,000, of which amount appellee checked less than $30,000. It clearly appears from the evidence that Saunders at all times maintained control of these funds, and

there is nothing in the record to show that appellee had the slightest authority to make payments by check to any one other than those who had performed labor for the contractor on the building that was then being erected. It would be unreasonable, and not at all warranted by the facts, to hold that it was the duty of appellee to guard these funds, so as to prevent Saunders from making payments out of the same on other contracts. We know of no rule by which appellee could be held responsible for the conduct of his principal, in view of the facts as shown by the evidence in this case.

[4] Under the last assignment of error it is insisted by counsel for appellants that appellee "has not disclosed when he first segregated his salary claim from that for loans made by him to Saunders, and has failed to produce the memorandum book showing the several items of his claim to which he first applied the funds in his hands."

Appellee testified that he checked some of these funds as a payment to himself on account for the loan made by him to Saunders. In other words, he had two claims against the contractor, to wit: The one for his salary which was secured by the bond which the sureties had executed, and upon which this suit was instituted; and the other for money which he had loaned to Saunders, and for which he had no security. It is well settled that, where one had funds in his hands belonging to a party who is indebted to him, a portion of which is secured and a portion unsecured, in the absence of a special direction from the debtor as to how the application should be made, he may apply such funds to the payment of his unsecured claim. This principle is so well settled that we do not deem it necessary to cite any authorities in support thereof.

Viewing this case in the light of the facts established and the law applicable thereto, we are impelled to the conclusion that the decree of the lower court was proper. For the reasons stated, the decree is affirmed.